Samuel E. MUNIZ, Petitioner-Appellant,

v.

Dr. George J. BETO, Director, Texas Department of Corrections, Respondent-Appellee.

No. 28617.

United States Court of Appeals, Fifth Circuit.

Nov. 5, 1970.

Joseph A. Calamia, John L. Fashing, El Paso, Tex., for petitioner-appellant.

Crawford C. Martin, Atty. Gen., of Tex., Allo B. Crow, Jr., Asst. Atty. Gen., Austin, Tex., Barton Boling, Dist. Atty., El Paso, Tex., Gilbert J. Pena, Asst. Atty. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Robert C. Flowers, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before GEWIN, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

We deal here with a constitutional right of no meager or paltry dimension. Basic to our decision in this case is the hallowed concept that the right to a grand jury chosen without discrimination is not a mere constitutional frill or furbelow.

This appeal is prosecuted by Samuel E. Muniz from the denial of his petition for a writ of habeas corpus in the United States District Court for the Western District of Texas. Muniz is a United States citizen of Mexican extraction who is presently incarcerated in a Texas prison pursuant to a conviction in a Texas state court. A major thrust of his present appeal is his contention that Mexican-Americans were underrepresented in the selection of grand jurors in the state court in which he was convicted. Agreeing with Muniz that he has met his burden of showing such discrimination, we reverse the district court's denial of relief.

The procedural history of this case is somewhat involved. Our story begins in 1942 in El Paso County, Texas, where appellant was indicted by a grand jury and subsequently convicted by a petit jury of the offense of rape by force. He was sentenced to a term of 20 years. His conviction was affirmed on direct appeal by the Texas Court of Criminal Appeals. Muniz v. State, 1943, 145 Tex. Cr.R. 565, 170 S.W.2d 767. On several occasions appellant was released from confinement on parole, but in each instance he violated the conditions of his parole and was returned to prison to serve the balance of his sentence. It is undisputed that he is presently in the custody of the Texas Department of Corrections pursuant to his 1942 conviction.

In 1967 appellant filed a pro se petition for a writ of habeas corpus in the state court in which he had been convicted and sentenced. Counsel was appointed to represent him in the state ha-beas corpus proceeding, and the same counsel has continued to represent appellant—with commendable diligence—in every subsequent proceeding. With the assistance of his appointed counsel appellant filed an amended petition in the state court in January of 1968.

In his amended petition appellant raised two principal issues, neither of which had been considered by the Texas Court of Criminal Appeals on direct appeal. First, he assailed the constitutional validity of his conviction on the ground that Mexican-Americans "were, because of their race or national origin, systematically excluded from service as jury commissioners, grand jurors and petit jurors in the County in which applicant was convicted although there was a substantial segment of the population of the same ancestry as petitioner in such county and community who were qualified to serve." Second, he contended that the State, through its prosecuting attorney, denied him a fair trial by making improper arguments to the jury and by introducing improper evidence.

After holding a plenary hearing the state court concluded that appellant was not entitled to habeas corpus relief and entered findings of fact and conclusions of law to that effect. The court's findings and conclusions are reprinted as Appendix I to this opinion. In addition, apparently at appellant's request, the state court entered "additional findings of fact." These supplemental findings, which did not change the result reached by the court, are reprinted as Appendix II to this opinion. The trial court's findings and conclusions were then transmitted to the Texas Court of Criminal Appeals in accordance with Article 11.07 of the Vernon's Ann.Texas Code of Criminal Procedure, and the Court of Criminal Appeals denied habeas corpus relief without written order on April 8, 1968. Appellant thereafter sought review in the United States Supreme Court, but his efforts were unsuccessful.[1]

1. In seeking review in the Supreme Court, Muniz filed both an appeal and a petition for a writ of certiorari. In his appeal he advanced the contention that Texas stat-

Having lost on the merits in the state courts and having failed to secure review in the Supreme Court, appellant next sought relief in the federal district court. In January of 1969 he filed a petition for a writ of habeas corpus in the court below, urging anew the contentions which he had asserted unsuccessfully in the state courts. Appellant did not seek an evidentiary hearing in the district court, for he acknowledged that the state court had received all the evidence necessary for disposition of his petition. He merely disagreed with the state court's interpretation of the evidence adduced in the state proceeding and with the state court's application of the law.

On May 9, 1969, the district court held a hearing to entertain arguments of counsel. Counsel for appellant attacked the validity of certain of the state court's findings and conclusions, while the State contended that those findings and conclusions "should be sustained." At the conclusion of the hearing the district court requested that both parties submit proposed findings and conclusions for its consideration. The State's response to the Court's request was to submit a formal proposal that the district court adopt the state court's findings and conclusions. In making this proposal the State had reference to the state court's *initial* findings and conclusions (set out as Appendix I to this opinion) and not to the state court's *supplemental* findings (set out as Appendix II to this opinion).

On June 27, 1969, the district judge indicated his approval of the State's proposal by affixing his signature to a copy of the state court's initial findings of fact and conclusions of law. Three days later, on June 30, 1969, the district judge entered a formal order denying habeas corpus relief, which order incorporated by reference the state court's initial findings and conclusions. The district court's order is reprinted as Appendix II to this opinion. Still later, on July 8, 1969, the State submitted an additional proposed order, and on that same day— July 8, 1969—the district judge affixed his signature thereto. This supplemental order captioned "Supplemental Findings and Conclusions as to Order Denying Petition for Habeas Corpus" is reprinted as Appendix IV to this opinion.

Muniz now appeals from the district court's denial of habeas corpus relief. In his brief to this court he lists 28 separate issues which he says are presented by his appeal, but we agree with the

---

utes pertaining to the selection of grand jury commissioners and grand jury members are unconstitutional on their face. He framed the question presented to the Supreme Court on appeal as follows:

"Is the Texas Statutory system or method of Grand Jury selection violative of the due process and equal protection clauses of the 14th Amendment to the United States Constitution because it lends itself to discriminatory practices against minority racial groups or other identifiable groups in that it has no provisions for random selection and imposes no duty upon the Grand Jury lists selectors (commissioners) to obtain a grand jury list fairly representing a cross section of the community, nor does it provide them with any guides or standards to obtain such a list; and which system allows the District Court to 'hand pick' both the grand jury commissioners and then the actual grand jury from the list submitted to the District Court by the Commissioners?"

The State responded to the appeal by filing a motion to dismiss, and the Supreme Court subsequently entered the following order:

"The motion to dismiss is granted and the appeal is dismissed for want of jurisdiction. Treating the papers whereon the appeal was taken as a petition for a writ of certiorari, certiorari is denied." Muniz v. Beto, 1968, 393 U.S. 22, 89 S.Ct. 51, 21 L.Ed.2d 22.

In his petition for certiorari Muniz advanced the arguments (1) that the application of state statutes in El Paso County had resulted in underrepresentation of Mexican-Americans among persons "serving as grand jury commissioners, grand jurors, and petit jurors" and (2) that the State, through its prosecuting attorney, had denied appellant, a fair trial by making improper jury arguments and introducing improper evidence. The Supreme Court denied certiorari. Muniz v. Beto, 1968, 393 U.S. 988, 89 S.Ct. 467, 21 L.Ed.2d 450.

State that appellant's many contentions constitute only five basic questions.

As we restate them, these five issues are the following:

(1) Were the Texas statutes which were in effect in 1942 with regard to the selection of grand jury commissioners and grand jurors unconstitutional on their face?

(2) Did the application of the Texas statutes result in total exclusion or substantial underrepresentation of Mexican-Americans in the selection of the grand jury commission, the grand jury, or the petit jury venire concerned with the indictment and trial of appellant?

(3) Did appellant waive any possible objection he may have had concerning the composition of the grand jury commission, the grand jury, or the petit jury venire?

(4) In the words of the State, 'Should modern-day concepts of jury composition be given retroactive application in this case?"

(5) Was appellant in any way denied a fair trial because of the prosecuting attorney's action?

## I.

Because our disposition of this case turns on other issues, we do not consider in any manner the initial issue—appellant's contention that Texas statutes with regard to the selection of grand jury commissioners and grand jurors are unconstitutional on their face.[2] We turn immediately to the second issue— appellant's contention that the *application* of the Texas statutory scheme in El Paso County in 1942 resulted in an unconstitutional underrepresentation of Mexican-Americans in the selection of grand jury commissioners, grand jurors, and the petit jury venire. In resisting this contention the State has not denied the right of a criminal defendant to be indicted and tried by juries whose members have been selected in a non-discrim-

inatory manner. Instead, the State has argued that appellant failed to meet his burden of proving discrimination against Mexican-Americans in the present case. Both the state court and the federal district court agreed with the State's position, but we are compelled to disagree.

■■ In attempting to meet his burden of proof in the present case, appellant relied on the "rule of exclusion" which originated in Norris v. Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074. Under this rule as it has been developed since *Norris*, a defendant can establish a prima facie case of discrimination by showing a disparity between (1) the percentage which his race constitutes of the group of persons from whom a jury list is drawn and (2) the percentage which his race constitutes of the jury list which is thereafter compiled. Once the defendant has established his prima facie case, the burden shifts to the State to offer a satisfactory explanation as to why the disparity exists. A graphic illustration of the application of this principle is provided by the opinion of the Supreme Court in Sims v. Georgia, 1967, 389 U.S. 404, 407–408, 88 S.Ct. 523, 525–526, 19 L.Ed.2d 634:

"Petitioner * * * contends that he was indicted and tried by juries from which members of his race had been unconstitutionally excluded. The facts reveal that the grand and petit jury lists were drawn from the county tax digests which separately listed taxpayers by race in conformity with then existing Georgia law. Negroes constituted 24.4% of the individual taxpayers in the county. However, they amounted to only 4.7% of the names on the grand jury list and 9.8% of the names on the traverse jury list from which petitioner's grand and petit juries were selected. The State's only response to that showing was to call one of the jury commissioners as a witness; the jury commissioner testi-

2. We do note in passing, however, that the Texas statutory scheme has passed constitutional muster on several occasions.

See Brooks v. Beto, 5 Cir. 1966, 366 F. 2d 1, 4 n. 4.

fied that he or one of the other commissioners knew personally every qualified person in the county and did not discriminate in selecting names for the jury lists. The facts in this case make it virtually indistinguishable from Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Accordingly, it is clear that the juries by which petitioner was indicted and tried were selected in a manner that does not comport with constitutional requirements. See also Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25."

■ In utilizing the rule of exclusion in the case at bar, appellant first sought to show that Mexican-Americans constituted a separately identifiable ethnic group in El Paso County in 1942. See Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. His proof of this fact was more than adequate and was never seriously disputed by the State.

Appellant's next task was to show a disparity between (1) the percentage which Mexican-Americans constituted of persons qualified for selection as grand jury commissioners, grand jurors, and petit jurors and (2) the percentage which Mexican-Americans constituted of the persons who were actually selected as grand jury commissioners, grand jurors, and members of the petit jury venire. Appellant introduced evidence which tended to show that a substantial percentage of the population of El Paso County in 1942 were persons with Spanish surnames. Some of his testimony indicated that in the early 1940's the percentage of El Paso County residents with Spanish surnames might have been as high as 50 percent, but the evidence to this effect consisted largely of guesses and estimates. The only precise statistical data relevant to Spanish surname percentages are reflected in the following

state court findings,[3] which were adopted by the court below:

"6. In 1939 there were 21,049 poll taxholders in El Paso County, Texas, of which 3,404 had Spanish surnames.

7. In 1940 there were 12,749 poll tax holders in El Paso County, Texas, of which 1,873 had Spanish surnames.

8. In 1941 there were 17,163 poll tax holders in El Paso County, Texas, of which 3,535 had Spanish surnames.

9. In 1942 there were 11,950 poll tax holders in El Paso County, Texas, of which 1,948 had Spanish surnames. In 1943, there were 20,206 poll tax holders in El Paso County, Texas, of which 3,171 had Spanish surnames."

Reduced to percentages, these findings indicate that of the total poll tax holders in El Paso County, persons with Spanish surnames constituted 16 percent in 1939, 15 percent in 1940, 21 percent in 1941, 16 percent in 1942, and 16 percent in 1943. On the basis of these statistics, it is reasonable to infer that in the early 1940's persons with Spanish surnames constituted at least 15 to 20 percent of the population of El Paso County. Indeed, there are intimations throughout the record that more adequate proof would have shown the percentages to be much higher.

Having established that a substantial percentage of the population of El Paso County in 1942 were persons with Spanish surnames, appellant introduced further evidence to show (1) that there were no persons with Spanish surnames on the grand jury commission connected with his case, (2) that there were no persons with Spanish surnames on the grand jury which indicted him, and (3) that there were only 10 persons with Spanish surnames among the 250 persons comprising the venire from which the jury that convicted him was chosen. We will consider in detail only the evidence concerning the selection and composition

3. The state court made a number of other findings that include various types of population figures (see Appendix I *infra;* Appendix II *infra*), but these findings are generally of little help in determining what percentage of the El Paso County population had Spanish surnames in 1942.

of the grand jury, for the evidence with regard to that body is overwhelming and is, without more, sufficient to invalidate appellant's conviction.

The Texas system for selecting grand juries was described by this court in Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1:

"Under Texas law the District Judge, usually prior to the opening of the term of court, selects not less than three nor more than five qualified persons from different portions of the county as Jury Commissioners, Art. 333. The judge instructs them on their duties, Art. 336, and administers a comprehensive oath, a significant portion of which is the obligation not to 'knowingly elect any man as juryman whom you believe to be unfit and not qualified,' Art. 335. This means, of course, that only those having the qualifications prescribed in Art. 339 may be chosen for the list of 16. Besides the traditional ones on residence, a limited voter qualification, absence of a criminal record, the most notable are the requirements that the grand juror '4. * * * must be able to read and write' and '3. * * * must be of sound mind and good moral character.'

"The Jury Commissioners thereupon select 16 qualified persons 'from the citizens of different portions of the county," Art. 338. The 16 selected are put on the list which is sealed and filed, Art. 340. When, in due course, the list is opened, the 16 persons on the list are summoned and inquiry is held as to their qualifications, and when the 12 are found qualified, the District Court impanels them as a grand jury. Arts. 344–345, 352–355, 357." 366 F.2d at 4–5 (footnotes omitted).

This system of selection was in effect at the time of appellant's indictment and trial in 1942.

The administration of this system in El Paso County was described by the state court in a finding of fact adopted by the court below:

"During the years 1936 through 1947, a grand jury commission consisting of three individuals was appointed for each term of court in El Paso County, Texas. During those years there were five terms of court each year. During said years for each term of court sixteen individuals would be called as a grand jury panel, of which twelve who first appeared and qualified would be selected as the grand jury itself." Finding of Fact No. 11, Appendix I *infra*.

The court's findings also included specific information about the number of Spanish surnamed persons serving on each grand jury. See Findings of Fact Nos. 12–24, Appendix I, *infra*. For purposes of analysis we will consider in depth the ten-year period from 1936 through 1945.

During this ten-year period a total of 50 grand juries were convened—five each year—and each of these 50 grand juries included 12 members. The following table shows the number of persons with Spanish surnames who served on each of the 50 grand juries:

| Year | January Term | April Term | July Term | September Term | November Term |
|---|---|---|---|---|---|
| 1936 | 0 | 0 | 1 | 1 | 1 |
| 1937 | 0 | 1 | 0 | 0 | 1 |
| 1938 | 0 | 0 | 1 | 0 | 0 |
| 1939 | 0 | 0 | 0 | 0 | 1 |
| 1940 | 1 | 0 | 0 | 0 | 0 |
| 1941 | 0 | 1 | 0 | 0 | 1 |
| 1942 | 0 | 0 | 0 | 0 | 1 |
| 1943 | 0 | 0 | 1 | 1 | 1 |
| 1944 | 0 | 0 | 0 | 1 | 0 |
| 1945 | 1 | 0 | 0 | 0 | 2 |

These figures do more than speak for themselves—they cry out "discrimination" with unmistakable clarity. The statistical summary for the ten-year period demonstrates conclusively that the exclusion of Spanish surnamed members from the grand jury which indicted appellant (July Term 1942) was no isolated aberration occurring by chance in a nondiscriminatory system of selection. On the contrary, persons with Spanish surnames were repeatedly underrepresented on or totally excluded from grand juries selected in El Paso County. Only once

(November Term 1945) did the percentage of Spanish surnamed persons on a grand jury even begin to approach the percentage of Spanish surnamed persons in the community at large. In a county where people with Spanish surnames constituted at least 15 to 20 percent of the population, only 18—a mere 3 percent—of the 600 grand jurors serving during the ten-year period had Spanish surnames.[4] Even the most charitable statistical tolerance conceivable would lead us inevitably to the conclusion that there was a substantial and unremitting incongruity between the racial composition of the grand juries and the ethnic demography of El Paso County.

It is obvious that appellant has met his burden of showing a statistical disparity. The burden thus shifts to the State to attempt to justify the substantial disparity which the figures reveal. The State's only real effort to explain is summed up in the following state court findings of fact, which were adopted by the court below:

"42. That a substantial number of persons of Mexican extraction who would otherwise be qualified to serve as Grand Jury Commissioners and as Grand Jurors during the years of 1936 through 1947 were not in fact qualified because of their inability to use and understand the English language or read and write English, and that there was a substantial number of persons of Mexican extraction who would be qualified.

"43. That during the years 1936 through 1947, it was commonplace for persons of Mexican extraction who were called for various jury duties to seek excuses because of their inability to read, write and speak English."

We are unpersuaded that these generalized findings are sufficient to explain away the substantial statistical disparity which appellant has established. Such factual explanations might assume signif-

icance if the disparity here involved were small, but they are certainly not enough to bridge the vast statistical chasm which has been shown to exist. Nor do we attach significance to the finding that the various grand jury commissioners who selected grand jurors in El Paso County "did not [consciously] exclude people from grand jury service on the basis of race, creed or color." Finding of Fact No. 40 Appendix I, *infra*. The *results* of the jury selection process are what count, and the results in this case clearly show discrimination against Mexican-Americans in the selection of grand jury members. We therefore hold that—on the basis of the grand jury figures alone—appellant has successfully discharged his burden of proof.

II.

Even if there is merit in appellant's arguments concerning the composition of the grand jury and the petit jury venire, the State argues that appellant waived his right to raise these arguments by failing to take appropriate actions at trial. The court below accepted this argument, adopting the state court's conclusion that the contentions now made by Muniz were "knowingly and effectively waived at the time of petitioner's trial." Conclusion of Law No. 7, Appendix I *infra*. This determination was based on the state court's findings that "the attorneys for petitioner" failed to move to quash the indictment returned by the grand jury or to object to the composition of the petit jury venire. See Findings of Fact Nos. 29–36, Appendix I *infra*.

In considering the waiver argument we note at once that the state court's findings are cast in terms of decisions on the part of appellant's *lawyers* and not in terms of decisions in which appellant *himself* participated in a knowledgeable manner. We do not base our rejection of the State's contention on this fact, how-

---

4. We note that during the same ten-year period (1936–1945) there were 50 grand jury commissions with a total of 150 members. Not one of these 150 grand jury commissioners had a Spanish surname.

ever, for we perceive in the waiver argument an even more fundamental flaw.

 It has long been held that waiver of a constitutional right or privilege means "an intentional relinquishment or abandonment of a *known* right or privilege." Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023 82 L.Ed. 1461 (emphasis added). Accordingly, the courts have repeatedly ruled that one cannot waive a constitutional right prior to the time such a right is declared to exist. See, *e. g.,* Grosso v. United States, 1968, 390 U.S. 62, 70–71, 88 S.Ct. 709, 19 L.Ed.2d 906; Baker v. Wainwright, 5 Cir. 1970, 422 F.2d 145, 149–150; Moreno v. Beto, 5 Cir., 1969, 415 F.2d 154. Applying these principles in the present case, we must conclude that appellant could not have waived his rights, for it was not until 1954—twelve years after appellant's indictment and trial—that Texas recognized the right of Mexican-American defendants to protest the exclusion or underrepresentation of Mexican-Americans in the composition of grand juries and petit jury venires. Indeed, the Texas Court of Criminal Appeals in the 1940's and the 1950's repeatedly held that Mexican-Americans could not be considered as an identifiable ethnic group for purposes of jury composition cases. Sanchez v. State, 1944, 147 Tex.Cr.R. 436, 181 S.W.2d 87; Salazar v. State, 1946, 149 Tex.Cr.App. 260, 193 S.W.2d 211; Sanchez v. State, 1951, 156 Tex.Cr.R. 243, 243 S.W.2d 700; Hernandez v. State, 1952, 160 Tex.Cr.R. 72, 251 S.W.2d 531.

In the 1951 *Sanchez* case, *supra,* the Texas court was most emphatic in rejecting a Mexican-American defendant's argument:

"The case is submitted on three bills of exception. The first, upon which reliance seems to be had, complains that there was violation of the due process clause in that there was a systematic, continual and uninterrupted practice in Fort Bend County of discriminating against the Mexican-Americans as a race, and people of Mexican extraction and ancestry as a class, in the selection of grand jury commissioners and grand jurors.

"Appellant has filed quite an exhaustive brief on the subject in which he discusses decisions of other jurisdictions which, either intentionally or loosely, refer to Mexican people as a different race. They are not a separate race but are white people of Spanish descent, as has often been said by this court. We find no ground for discussing the question further and the complaint raised by this bill will not be sustained." 243 S.W.2d at 701.

Less than a year later, in *Hernandez, supra,* the Texas court reiterated its position:

"To our minds, it is conclusive that, in so far as the question of discrimination in the organization of juries in state courts is concerned, the equal protection clause of the Fourteenth Amendment contemplated and recognized only two classes as coming within that guarantee: the white race, comprising one class, and the Negro race, comprising the other class." 251 S.W.2d at 535.

The Supreme Court granted certiorari in *Hernandez,* and in 1954 the Court issued an opinion reversing the judgment of the Texas Court of Criminal Appeals. Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. In its opinion the Court made it clear that Mexican-Americans could be considered an identifiable ethnic group in jury composition cases:

"The State of Texas would have us hold that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment. The decisions of this Court do not support that view [footnote omitted]. And, except where the question presented involves the exclusion of persons of Mexican descent from juries [footnote omitted], Texas courts have taken a broader view of the scope of the equal protection clause [footnote omitted].

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a 'two-class theory'—that is, based upon differences between 'white' and Negro." 347 U.S. at 477–478, 74 S.Ct. at 670.

As is obvious from the above discussion, Muniz could not have known, prior to *Hernandez*, that Texas would entertain his objection to the composition of the grand jury and the petit jury venire. Consequently, his failure to make objection at his pre-*Hernandez* trial cannot be held to constitute a waiver of his constitutional rights. Texas had obdurately and consistently refused to recognize the right of a Mexican-American to be indicted by a grand jury from which people of that ancestry had not been systematically excluded. That which Texas repeatedly refused to recognize we cannot expect Muniz or his counsel to have futilely raised.

### III.

█ If all else fails, the State falls back on the argument that "modern-day concepts of jury composition" should not "be given retroactive application in this case." With regard to this contention we take note of the fact that the Supreme Court, in a series of recent decisions beginning with Linkletter v. Walker, 1965, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, has made it clear that *new* consti-

tutional interpretations related to criminal procedure may sometimes be denied retroactive application. Consequently, if the present case involved a *new* constitutional interpretation, we would be obliged to consider the criteria which have been developed in *Linkletter* and its progeny. See, *e. g.*, Stovall v. Denno, 1967, 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

The problem with the State's argument is that the present case does not involve any *new* constitutional interpretation. We are neither announcing new doctrine nor following new doctrine. On the contrary, in deciding this case we merely apply a well-settled doctrine of long standing. As long ago as Strauder v. West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664, the Supreme Court held that racial discrimination in jury selection is a violation of the equal protection clause of the Fourteenth Amendment. In *Strauder* the class excluded consisted of Negroes, but the Court noted the application of the equal protection clause to other groups:

" * * * If in these States where the colored people constitute a majority of the entire population a law should be enacted excluding all white men from jury service, thus denying to them the privilege of participating equally with the blacks in the administration of justice, we apprehend no one would be heard to claim that it would not be a denial to white men of the equal protection of the laws. Nor if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the Amendment."

In Norris v. Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, the Court first approved the use of the "rule of exclusion" as a tool for proving the existence of discrimination in jury selection. In Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, as we have noted, the Court made it crystal clear that Mexican-Americans can challenge a jury selection system which discriminates against Mexican-Americans.

Neither in these decisions nor in any of the myriad other decisions dealing with jury discrimination has the Supreme Court ever suggested that any aspect of a criminal defendant's constitutional right to non-discriminatory jury selection is to be denied retroactive application. Thus we feel compelled to reject the State's retroactivity argument.

## IV.

Since we set aside appellant's conviction on the basis of his grand jury composition argument, we need not consider his final contention—that the State, through its prosecuting attorney, denied him a fair trial by making improper arguments to the jury and by introducing improper evidence. If the State of Texas decides to re-indict Muniz, we are confident that any errors that might have occurred at his first trial will not be allowed to occur at the new trial.

For the reasons given herein, the judgment of the district court denying habeas corpus relief is hereby reversed, and the case is remanded with directions to issue the writ releasing Muniz from custody on his present conviction and sentence. If the State elects to re-indict and re-try Muniz the district court should delay his actual discharge from custody for a reasonable time to be fixed by the court.

## APPENDIX I

IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS, THIRTY FOURTH JUDICIAL DISTRICT

No. 21,214

IN RE:
SAMUEL E. MUNIZ

### FINDINGS OF FACT

After consideration of all the evidence, the pleadings and arguments of counsel, the Court finds the facts in this cause as follows:

1. The petitioner was charged by indictment with the offense of rape alleged to have occurred on or about the 16th day of July, 1942, in the County of El Paso, Texas, said indictment being filed with the Clerk of the Thirty Fourth Judicial District Court, El Paso County, Texas, on the 24th day of July, 1942, under file No. 14,341.

2. Petitioner was convicted on that indictment in El Paso County, Texas on October 13, 1942 before a jury on a plea of not guilty. The jury found the petitioner guilty and assessed his punishment at twenty-years (20) in the State Penitentiary. On the 16th day of October, 1942, the Court sentenced the petitioner, pursuant to that conviction, to not less than five (5) nor more than twenty (20) years in the State Penitentiary, in Cause No. 14,341, and petitioner is presently confined pursuant to said conviction. Certified copies of the indictment, judgment and sentence in said Cause No. 14,341 having been admitted in evidence in the above entitled and numbered proceeding as State's exhibits are hereby certified as original exhibits and are sent forward herewith.

3. Petitioner was and is a member of an ethnic group known as American Citizens of Mexican Extraction.

4. According to the United States census of 1930, the total population of El Paso County, Texas was 131,597. In 1930 there were 77,389 persons of Mexican extraction living in El Paso County. There is no evidence offered to indicate whether the numbers in 1930 were male or female, their ages, or their qualifications to serve on a grand jury or a petit jury.

5. In 1940 the United States census shows that the total population of El Paso County, Texas was 131,067. Of that total, there were 37,017 of which were males over twenty-one years of age. There was no evidence as to how many of the males over twenty-one were of Mexican extraction or were qualified to serve as members of a grand jury or a petit jury. The 1940 census shows that the total population of the State of Texas was 6,414,824, of which 387,820 were classified as Spanish mother tongue.

6. In 1939 there were 21,049 poll tax holders in El Paso County, Texas, of which 3,404 had Spanish surnames.

7. In 1940 there were 12,749 poll tax holders in El Paso County, Texas, of which 1,873 had Spanish surnames.

8. In 1941 there were 17,163 poll tax holders in El Paso County, Texas, of which 3,535 had Spanish surnames.

9. In 1942 there were 11,950 poll tax holders in El Paso County, Texas, of which 1,948 had Spanish surnames. In 1943, there were 20,206 poll tax holders in El Paso County, Texas, of which 3,171 had Spanish surnames.

10. The United States census for 1950 shows that the total population of El Paso County, Texas was 194,968, of which amount 21,584 were males of Spanish extraction over the age of twenty-one years.

11. During the years 1936 through 1947, a grand jury commission consisting of three individuals was appointed for each term of court in El Paso County, Texas. During those years there were five terms of court each year. During said years for each term of court sixteen individuals would be called as a grand jury panel, of which twelve who first appeared and qualified would be selected as the grand jury itself.

12. In the year 1936 no person with a Spanish surname served on the grand jury commission. In the July term, 1936, one person with a Spanish surname served on the grand jury, and in the September term, 1936, one person with a Spanish surname served on the grand jury. At the November term, 1936, one person with a Spanish surname served on the grand jury.

13. In 1937, no person with a Spanish surname served on the grand jury commission in El Paso County, Texas. At the April term, 1937, one person with a Spanish surname served on the grand jury. At the November term, 1937, one person with a Spanish surname served on the grand jury.

14. In 1938, no person with a Spanish surname served on the grand jury commission in El Paso County, Texas. At the July term, 1938, there was one person with a Spanish surname that served on the grand jury.

15. In 1939, no person with a Spanish surname served on the grand jury commission. At the November term, 1939, one person with a Spanish surname served on the grand jury.

16. In 1940, no person with a Spanish surname served on the jury commission. At the January term, 1940, one person with a Spanish surname served on the grand jury.

17. In 1941, no person with a Spanish surname served on the grand jury commission. At the April term, 1941, one person with a Spanish surname served on the grand jury. At the November term, 1941, one person with a Spanish surname served on the grand jury.

18. In 1942, no person with a Spanish surname served on the grand jury commission. At the November term, 1942, one person with a Spanish surname served on the grand jury.

19. In 1943, no person with a Spanish surname served on the grand jury commission. At the July term 1943, one person with a Spanish surname served on the grand jury. At the September term, 1943, one person with a Spanish surname served on the grand jury. At the November term, 1943, one person with a Spanish surname served on the grand jury.

20. In 1944, no person with a Spanish surname served on the grand jury commission. At the January term, 1944, one person with a Spanish surname was called on the grand jury panel but did not serve as a member of the grand jury itself. At the September term, 1944, one person with a Spanish surname served on the grand jury. At the November term, 1944, one person with a Spanish surname was called on the grand jury panel but did not serve on the grand jury itself.

21. In 1945, no person with a Spanish surname served on the grand jury commission. At the January term, 1945, one

person with a Spanish surname served on the grand jury. At the November term, 1945, two persons with Spanish surnames served on the grand jury.

22. In 1946, one person with a Spanish surname served on the grand jury commission for the September term. At the April term, 1946, one person with a Spanish surname served on the grand jury. At the July term, 1946, one person with a Spanish surname was called on the grand jury panel but did not serve on the grand jury. At the September term, 1946, three persons with Spanish-American surnames served on the grand jury. At the November term, 1946, two persons with Spanish surnames served on the grand jury.

23. In 1947, no person with a Spanish surname served on the grand jury commission. At the January, April, July and September terms of 1947, one person with a Spanish surname was called for grand jury service during each of those terms.

24. There was one person with a Spanish surname called to serve on the grand jury for the January term, 1948.

25. At his trial petitioner was represented by Joseph M. Roybal and Morton Dodrill, who were retained by petitioner.

26. The special venire jury list from which the jury that tried petitioner was selected contained 250 prospective jurors of which ten had Spanish surnames. None of the twelve of the jurors that actually heard petitioner's case had Spanish surnames.

27. From 1940 until the present time, there were and are an undetermined number of American citizens of Mexican extraction who do not have Spanish surnames.

28. At the time of his trial, petitioner was a member of the United States Army and appeared in court during his trial in Army Uniform.

29. The attorneys for petitioner were fully aware prior to the trial of petitioner, of petitioner's right to be indicted by a grand jury and tried by a petit jury which were selected without regard to race, creed or color.

30. The attorneys for petitioner were fully aware, prior to the trial of petitioner, of petitioner's right to move to quash or to legally question the indictment returned by the grand jury in this case if they believe American citizens of Mexican extraction had been systematically excluded from the grand jury that indicted petitioner, or from the jury commission that selected the grand jury which indicted petitioner.

31. The attorneys for petitioner were fully aware, prior to the trial of petitioner, of petitioner's right to move to quash or to legally question the special venire list of prospective jurors from which the jury in the case was to be selected if they believed that American citizens of Mexican extraction had been systematically excluded from that petit jury or special venire jury list.

32. The attorneys for petitioner filed no motions to quash or to object to the grand jury commission, the grand jury panel, or the petit jury panel making up the special venire list in this case on the basis of a systematic exclusion of American citizens of Mexican extraction.

33. The attorneys for petitioner filed no motions to quash or to object to the indictment against the petitioner in this case on the basis of a systematic exclusion of American citzens of Mexican extraction from the grand jury that indicted the petitioner.

34. One of the attorneys for petitioner, Mr. Roybal, had in previously tried cases, in this and adjoining counties, filed motions to quash indictments and petit jury panels on the allegation of systematic exclusion of American citizens of Mexican extraction.

35. The attorneys for petitioner, after having conferred on whether to file such motions to quash in this case, elected not to do so.

36. Under Texas practice at the time petitioner was tried in this case, the attorneys for petitioner could have filed

such motions to quash and had them heard and ruled upon out of the presence of any petit jury panel selected to try the petitioner.

37. That prior to the time petitioner was tried, at the time petitioner was tried and at this time, El Paso County used the jury wheel in making up petit jury panels and special venire panels.

38. At all times relevant to this proceeding, the tax assessor and collector furnished the District Clerk with the appropriate names from their poll tax list and property tax list for inclusion in the jury wheel.

39. The special venire list from which the jury was selected that tried the petitioner was drawn from the jury wheel and there is absolutely no evidence that anything improper was done in that regard as to including prospective jurors' names in the jury wheel or the drawing of petit jury or special venire list from the jury wheel.

40. At all times relevant to these proceedings, the District Judge affirmatively instructed all grand jury commissioners to not exclude anyone from grand jury service or prospective grand jury service on the basis of race, creed or color, and this Court finds that the various jury commissioners did not exclude people from grand jury service on the basis of race, creed or color.

41. After petitioner's conviction in Cause Number 14,341, his attorneys gave notice of appeal and pursuant to said appeal filed several formal bills of exceptions. The opinion of the Texas Court of Criminal Appeals on petitioner's appeal is reported in 170 S.W.2d 767 (1943). At no time in any of the appellate proceedings did petitioner raise any question relating to exclusion of persons of Mexican extraction from the Grand Jury Commission, the Grand Jury or the petit jury, although his attorneys were aware of the right to do so.

42. That a substantial number of persons of Mexican extraction who would otherwise be qualified to serve as Grand Jury Commissioners and as Grand Jurors during the years of 1936 through 1947 were not in fact qualified because of their inability to use and understand the English language or read and write English, and that there was a substantial number of persons of Mexican extraction who would be qualified.

43. That during the years 1936 through 1947, it was commonplace for persons of Mexican extraction who were called for various jury duties to seek excuses because of their inability to read, write and speak English.

44. That at the trial of the petitioner the District Attorney did not appeal and incite the jury to racial prejudice and did not prejudice or inflame the jury against petitioner because of his race.

45. At the trial of petitioner the District Attorney did not improperly bring before the jury testimony that was inadmissible concerning alleged wrongful acts of the petitioner of an extraneous nature which involved prejudicial and inflammatory evidence.

46. At the trial of petitioner the District Attorney did not bring before the jury improper hearsay proof of the reputation of petitioner, which was irrelevant and immaterial and calculated to inflame the minds of the jury against the petitioner.

## CONCLUSIONS OF LAW

Upon the consideration of the facts, the pleadings and the arguments, the Court makes the following conclusions of law:

1. Petitioner is lawfully confined by the Texas Department of Corrections.

2. Petitioner was given a fair trial by a fair and impartial jury.

3. There was not, during the period relevant to this proceeding, a systematic exclusion or token inclusion of American citizens of Mexican extraction from jury commissioners, grand juries, or petit juries, including special venire juries.

4. There was not a systematic exclusion or token inclusion of American citizens of Mexican extraction on the jury commission that selected the grand jury

that indicted the petitioner, nor was there systematic exclusion or token inclusion of American citizens on the grand jury that indicted petitioner, and neither was there systematic exclusion or token inclusion of American citizens of Mexican extraction on the special venire petit jury list that tried petitioner.

5. The Texas statutory system in effect at the time petitioner was indicted and now, does not violate the federal or state constitution or deny any right or privilege guaranteed to any person by the Constitution of the United States or of this State.

6. Petitioner has not been denied any right or privilege guaranteed to him by the Constitution of the United States or of this State.

7. Any contention made by petitioner of alleged systematic exclusion or token inclusion of American citizens of Mexican extraction from grand jury commission, grand juries or petit juries, was knowingly and effectively waived at the time of petitioner's trial, and such allegations cannot now be properly urged by petitioner.

8. The petition for habeas corpus is wholly without merit and is denied.

The foregoing findings and conclusions are supported by the facts adduced at the hearing in this court before the undersigned Judge, together with the accompanying original exhibits admitted into evidence at such hearing and duly identified and authenticated by the official Court Reporter of this Court. Said Court Reporter is hereby directed to prepare a transcript of all the proceedings shown by the Court Reporter's notes in question and answer form, certify the same, as well as to the accompanying of original exhibits, submit same for my approval and transmit all of the same to the Clerk of the Court of Criminal Appeals. Further, the District Clerk is hereby directed to file this instrument, record this order, and include same in the transcript of all pleadings filed in this hearing and transmit said transcript to the Clerk of the Court of Criminal Appeals as provided by law.

SIGNED AND ENTERED this 15th day of March, 1968.

 (Signed) WILLIAM E. WARD
 JUDGE William E. Ward

APPROVED AS TO FORM:

(Signed) JOSEPH A. CALAMIA
 Joseph A. Calamia
 Attorney for Petitioner

(Signed) BARTON BOLING
 Barton Boling
 District Attorney

## APPENDIX II

### IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS, THIRTY FOURTH JUDICIAL DISTRICT

### No. 21,214

IN RE: SAMUEL E. MUNIZ

In addition to the findings of fact already made, the Court makes the following additional findings of fact:

1. That between January 1936 and January 1948 there were sixty-two terms of court of which one term was a special term (in 1938).

2. That during these sixty-two terms of court there were called and duly empaneled 186 jury commissioners of which only one was a person with a Mexican or Spanish surname, to wit: Modesto Gomez.

3. That a total of 1,007 names appear on the Grand Jury lists for these sixty-terms of court, of which total only 32 were of Mexican or Spanish surnamed.

4. Of these 32 Mexican or Spanish surnames the following were called on the grand jury lists more than once, to wit: Modesto Gomez, 9 times; A. N. Gonzales, 3 times; E. C. Sierra, 2 times; Joe M. Moreno, 2 times; Cleofas Calleros, 2 times; J. J. Anchondo, 2 times; J. Escajeda, 2 times. Therefore, although it appears that persons with Spanish or Mexican surnames were called on 32 occasions, only 17 individuals with Spanish surnames were involved in such 32 occasions during such 62 terms of court.

5. That a total of 744 names appear as Grand Jurors during these 62 terms of court, of which 21 were Spanish or Mexican surnames.

6. Of these 21 Mexican or Spanish surnames, the following rendered Grand Jury service more than once, to wit: Modesto Gomez, 6 times; A. H. Gonzalez, 3 times. Therefore, although it appears that persons with Mexican or Spanish surnames rendered Grand Jury service on 21 occasions, only 14 individuals with Mexican or Spanish surnames are involved in such 21 occasions during such 62 terms of court.

7. That in 1942, or 1943, it is estimated that approximately 40 to 50% of the total population of El Paso County, Texas was of Mexican extraction and was identifiable by the Mexican or Spanish surnames.

8. That in 1950 the total population of El Paso County, Texas was 194,968, of which 89,555 were of Mexican extraction.

9. That the total population of El Paso County, Texas in 1960 was 314,070, of which 136,993 were of Mexican extraction.

10. The total males with Mexican or Spanish surnames in El Paso in the metropolitan area in 1950 was 31,870.

11. The total males with Spanish or Mexican surnames in the El Paso urban area in 1950 was 43,947.

12. The total males over 21 with Mexican or Spanish surnames in El Paso County, Texas in 1950 was 21,584.

13. The total male population in El Paso County, Texas with Mexican or Spanish surnames in 1950 was 65,255.

14. That prior to 1942 and for some years thereafter there were instances in intermarriage between persons with Mexican or Spanish surnames and of Mexican extraction, with persons of Anglo-Saxon ancestry.

15. That at the time of his trial the petitioner was 20 years old and had only obtained a seventh grade education.

16. Petitioner denies that he knew or was aware of his right to file motions to quash the grand jury panel or the special venire jury panel, or the petit jury that tried him, and he denies that he consented or agreed to his lawyers not filing such motions, and he denies that his lawyers ever conferred with him about such rights.

17. That from 1939 to 1945 it is estimated that approximately 25% of the property owners in El Paso County, Texas on the property tax roles were of Mexican or Spanish-American descent.

18. That from 1945 to 1950, 50% of the total enrollment in the El Paso Public School System (including high school) were of Mexican extraction or descent.

19. Under Texas procedure it is up to the Trial Court to call Grand Jury commissioners, pass on their qualifications and excuses and it is up to the trial court to pass on the qualifications and excuses of persons whose names appear on the Grand Jury lists. The Grand Jury commissioners select the names of persons that appear on the Grand Jury lists which is made up of 16 persons, then it is up to the trial court to pass on the qualifications and excuses of these persons who have appeared on the Grand Jury lists and make up a Grand Jury of 12 persons and it is up to the trial court to pass on all of the qualifications and on the excuses of persons who appear on the petit jury panels. It is not up to the Grand Jury commissioners to pass on the excuses of persons whose names they have selected on the Grand Jury list. As qualified above in this paragraph, by their selection of the lists it is not up to the jury commissioners to select the grand jury who actually serves. It is not up to the Sheriff or the District Clerk but the trial court to pass on the qualifications and excuses for jurors summoned for petit jury service.

20. The qualifications a person must have possessed to be a grand jury commissioner at the times relevant to the indictment in this case were that the person be an intelligent citizen of El Paso

County, Texas, and be able to read and write the English language; that he be a qualified juror and a freeholder in El Paso County, Texas; and that he have no suit in that court which required a jury. It was the duty of the District Judge appointing the three jury commissioners to see that they possessed the necessary qualifications and further to see that the appointed commissioners were residents of different portions of the county. Old Art. 333 (C.C.P.)

21. The jury commissioners as part of their oath swore that they would not knowingly elect any man as a grand juror whom they believed to be unfit and not qualified. To be qualified to be selected or to serve as a grand juror the person must have been a citizen of El Paso County, Texas; be a qualified voter and have a poll tax; be a freeholder within the State or a householder within El Paso County; be of sound mind and good moral character; be able to read and write English; not be under indictment or other legal accusation for theft or any felony; and must not have been convicted of any felony. Old Art. 335, 339 (C.C.P.)

Dated this 15th day of March, 1968.
Approved as to form only
Barten Boling
District Attorney

(Signed) WILLIAM E. WARD
JUDGE
William E. Ward

### APPENDIX III

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS EL PASO DIVISION

SAMUEL E. MUNIZ
Petitioner,
versus NO. EP–69–CA–5

DR. GEORGE J. BETO, Director,
Texas Department of Corrections.

On the 9th day of May, 1969, came on to be heard the above petition for Writ of Habeas Corpus, and the Court having received the evidence offered by the Petitioner and by the Respondent, and having heard the argument of counsel, took said matter under advisement and after consideration of same, is of the opinion that said Petition is without merit and should be denied, and the Court has filed herewith its Findings of Fact and Conclusions of Law, upon which this Order is entered, which are made a part of this Order.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that said Petition for Writ of Habeas Corpus be, and hereby is DENIED in all things.

ENTERED THIS 30th day of June, 1969.

(Signed) ERNEST GUINN
UNITED STATES DISTRICT JUDGE
Ernest Guinn

### APPENDIX IV

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF TEXAS EL PASO DIVISION

SAMUEL E. MUNIZ,
Petitioner

versus CIVIL ACTION
NO. EP–69–CA–5

DR. GEORGE J. BETO,
DIRECTOR, TEXAS DEPARTMENT OF CORRECTIONS,
Respondent

*SUPPLEMENTAL FINDINGS AND CONCLUSIONS AS TO ORDER DENYING PETITION FOR HABEAS CORPUS*

Samuel E. Muniz, Petitioner herein, seeks a Writ of Habeas Corpus under 28 U.S.C. § 2241.

On October 13, 1942, Petitioner was convicted of the felony offense of Rape by Force in the 34th Judicial District Court of El Paso County, Texas, with punishment assessed at confinement in the State penitentiary for a term of twenty (20) years. This conviction was affirmed by the Texas Court of Criminal Appeals in State v. Muniz, 145 Tex.Cr.R. 565, 170 S.W.2d 767 (1943). On several

occasions Petitioner has been released from confinement on parole, but in each instance his parole has been revoked. Petitioner filed an Application for Writ of Habeas Corpus in the 34th Judicial District Court of El Paso County, Texas, and was afforded a full evidentiary hearing on the facts alleged, at which Petitioner was duly represented by counsel appointed by the Court. The Court entered its Findings of Fact and Conclusions of Law and the entire record was certified to the Texas Court of Criminal Appeals, which denied the application on April 8, 1968, without written order.

Petitioner then appealed the order of the Texas Court of Criminal Appeals to the Supreme Court of the United States in Muniz v. Beto, No. 430, Misc., in which the Supreme Court in a per curiam opinion dated October 14, 1968, affirmed the Texas Court of Criminal Appeals in the following language:

"IT IS FURTHER ORDERED that the appeal herein be, and it is hereby, dismissed for want of jurisdiction.

"Treating the papers wherein the appeal was taken as a Petition for Writ of Certiorari, certiorari is denied."

Muniz v. Beto, 393 U.S. 22, 89 S.Ct. 51, 21 L.Ed.2d 22 (1968).

In addition to his appeal, Applicant also petitioned the Supreme Court of the United States for Writ of Certiorari in Muniz v. Beto, No. 722 Misc., in which the Supreme Court denied certiorari in Muniz v. Beto, 393 U.S. 988, 89 S.Ct. 467, 21 L.Ed.2d 450 (1968).

The ground for relief which Petitioner urges here, as he did for the first time in his Application to the state court and before the United States Supreme Court, is that he is a person of Mexican descent and that persons of similar ancestry were systematically excluded and included in the selection of jury commissioners, which selected the Grand Jury which indicted Petitioner, from that Grand Jury which did indict Petitioner and from the Petit Jury which tried Petitioner. Petitioner does not raise issue

with the adequacy of his state court hearing, but does urge that, based upon the evidence of such hearing and the Findings of Fact of such court, the court below as well as the Supreme Court of the United States erroneously denied Petitioner his relief.

This Court, having considered the Petition, brief in support thereof, Respondent's answer, transcript of the hearing held in the state court of conviction, the Findings of Fact and Conclusions of Law entered by said court and the arguments of counsel presented to this Court, specifically finds:

(1) That the merits of the factual dispute here presented was resolved in the state court hearing;

(2) That the fact finding procedure employed by the state court was adequate to afford a full and fair hearing;

(3) That the material facts were adequately developed at the state court hearing;

(4) That the state court had jurisdiction of the subject matter and over the person of Petitioner in the state court proceedings;

(5) That the applicant was represented by competent counsel in the state court proceedings;

(6) That the Petitioner received a full, fair and adequate hearing in the state court proceedings;

(7) That Petitioner was not otherwise denied due process of law in the state court proceedings; and

(8) That the Findings of Fact and Conclusions of Law determined in the state court proceedings are fairly supported by the record in this case.

It further appears that no new material has been alleged for this Court's consideration; that the Findings of the state district court were proper and correct and that the Conclusions of Law were consistent therewith. Moreover, the factual determinations of that Court are fairly supported by the record, and the standards used in the procedures employed in said hearing were adequate and fair and this Court does adopt as

its Findings of Fact and Conclusions of Law the original Findings of Fact and Conclusions of Law of the state court, the same being Respondent's Proposed Findings of Fact and Conclusions of Law, submitted to this Court, which will be included in this Order by appendix.

The Supreme Court in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963), in expanding the guidelines of federal habeas corpus, cautioned that the hearing power of the federal district courts should not be "used to subvert the integrity of state criminal justice or waste the time of federal courts in the trial of frivolous claims," and stated that after a federal district judge concluded that the habeas applicant was afforded a full and fair hearing by the state courts resulting in reliable Findings, he might and ordinarily should, accept the facts as found in the hearing. See also 28 U.S.C. § 2254(d) and Brooks v. Wainwright, 402 F.2d 105 (5th Cir. 1968).

In accordance with the above Conclusions the Petition must, therefore, be, and the same is hereby in all things, DENIED, and it is SO ORDERED.

(Signed) ERNEST GUINN
UNITED STATES DISTRICT JUDGE

The court having previously filed its Judgment herein approves this suggested judgment as supplemental findings & conclusions.

7/8/69

(Signed) EARNEST GUINN
JUDGE

GEWIN, Circuit Judge, concurring in part, and dissenting in part.

I concur in the result reached by the majority under the facts presented and am in essential agreement with subdivisions, I, II and IV of the excellent opinion written by Judge Goldberg. This case is unusual and distinctive because Muniz was denied any effective remedy with respect to discriminatory jury composition due to the fact that at the time of his trial in 1942 Texas did not recog-

nize Mexican-Americans as an identifiable ethnic group. Such fact is clearly shown by the majority opinion. See Sanchez v. State, 147 Tex.Cr.R. 436, 181 S.W.2d 87 (1944); Salazar v. State, 149 Tex.Cr.App. 260, 193 S.W.2d 211 (1946); Sanchez v. State, 156 Tex.Cr.R. 243, 243 S.W.2d 700 (1951); Hernandez v. State, 160 Tex.Cr.R. 72, 251 S.W.2d 531 (1952). The Texas law was not changed until the Supreme Court decided Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L. Ed. 866 (1954). This unique situation places Muniz in an odd category and in my opinion entitles him to the relief granted.

I must disagree with the retroactivity aspect of the majority opinion as delineated in section III. In my view the opinion fails to give proper consideration to the principles which control retroactivity. I would apply the holding in this case prospectively only, and limit its application to this case, to cases on direct appeal and to pending cases (including habeas corpus and 2255 cases) in which the jury composition issue has been raised. See Blake v. United States, 407 F.2d 908 (5th Cir. 1969). In reaching this conclusion I do not disparage, in any sense, the constitutional guarantee involved. A choice between retroactivity and non-retroactivity does not require disparagement.

> We here stress that the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved * * * [W]e do not disparage a constitutional guarantee in any manner by declining to apply it retroactively.

Johnson v. New Jersey, 384 U.S. 719, at 728, 86 S.Ct. at 1778, 16 L.Ed.2d 882, at 889.

The majority opinion asserts, "We are neither announcing new doctrine nor following new doctrine." However, in dealing with the question of waiver, it is declared by the majority:

> Applying these principles in the present case, we must conclude that appellant could not have waived his rights,

for it was not until 1954—twelve years after appellant's indictment and trial —that Texas recognized the right of Mexican-American defendants to protest the exclusion or underrepresentation of Mexican-Americans in the composition of grand juries and petit jury venires. Indeed, the Texas Court of Criminal Appeals in the 1940's and the 1950's repeatedly held that Mexican-Americans could not be considered as an identifiable ethnic group for purposes of jury composition cases.

To support its retroactivity holding the majority relies on Strauder v. West Virginia, 100 U.S. 103, 25 L.Ed. 664 (1880) and Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), and observes that the rule prohibiting discrimination in jury selection is an ancient rule. What the majority apparently overlooks is the fact that the excluded class in *Strauder* and in *Norris* consisted of Negroes. Mexican-Americans as an identifiable and distinct ethnic group had not been recognized at the time of the decision in *Strauder* in 1880 or when *Norris* was decided in 1935. The first recognition of Mexican-Americans as an ethnic group or distinct class as related to the issue here under consideration occurred when the *Hernandez* case was decided in 1954, seventy-four years after *Strauder*. The opinion relies on no cases decided by this court in which the Mexican-American jury composition question was decided prior to this time within the purview of the present factual situation. If Muniz had been tried and convicted after the *Hernandez* decision, serious questions as to waiver would be presented. Indeed, the findings of the state court might constitute a serious impediment to the application of the waiver principle in favor of Muniz.[1]

In a sense the existence of every constitutional right parallels the existence of the provision in the Constitution upon which such right is grounded. Our holding as to Muniz recognizes a new constitutional principle in substantially the same fashion as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), declared a new constitutional concept. Well over a decade before the decision in *Mapp*, the case of Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), condemned unreasonable searches and seizures by state officers as violative of the Fourth and Fourteenth Amendments. *Mapp* was new only to the extent that it required the application of the exclusionary rule in state court proceedings. Therefore, even though racial discrimination in the selection of juries has long been condemned with respect to Negroes, the recognition of the right of Mexican-Americans as a distinct ethnic group to challenge indictments because of discrimination is a clear and unequivocal break with the past.

It is pertinent to observe that one of the leading cases dealing with the retroactivity problem arose in this court, United States ex rel. Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1963), affirmed by the Supreme Court, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In those opinions this court and the Supreme Court enunciated guidelines and principles to be followed in deciding whether a decision should be applied retroactively or prospectively. Both decisions recognized the fact that fundamental constitutional rights were involved. Such rights were not considered "meager or paltry" nor were they described as "a mere constitutional frill or furbelow."[2] Notwithstanding the importance and gravity of the constitu-

---

1. See Appendix I wherein the state court found:

 34. One of the attorneys for petitioner, Mr. Roybal, had in previously tried cases, in this and adjoining counties, filed motions to quash indictments and petit jury panels on the allegation of systematic exclusion of American citizens of Mexican extraction.

 35. The attorneys for petitioner, after having conferred on whether to file such motions to quash in this case, elected not to do so.

2. See majority opinion page 1.

tional issues involved, both *Linkletter* decisions held that the rule of *Mapp* should be applied prospectively only.

In a long and impressive list of cases many courts have refused to apply new rules affecting criminal procedures retroactively. See 10 A.L.R.3d 1371, 1384. The following Supreme Court decisions will serve to illustrate and emphasize the point, Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L. Ed.2d 453 (1966) (adverse comment upon failure of state defendant to testify unconstitutional); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882 (1966) (police interrogation in violation of *Escobedo* and *Miranda* principles); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (identification in police line-up without counsel); DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (state criminal convictions in violation of the constitutional right to jury trial); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1964) (electronic surveillance in violation of the Fourth Amendment). Pertinent to the problem is the following observation by Mr. Justice Stewart:

> Thus we must reckon here, as in Linkletter, 381 U.S. at 636, 85 S.Ct., at 1741, 14 L.Ed.2d at 612, with decisional history of a kind which Chief Justice Hughes pointed out "is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration."

Tehan v. United States ex rel. Shott, *supra*, 382 U.S. at 413, 86 S.Ct. at 463.

It appears to me that the majority holds that the only factor to be considered in determining retroactivity vel non is whether the case involves a "new constitutional interpretation." Having so decided every other consideration is brushed aside. While I can not agree that *Muniz* presents "nothing new," the position of the majority still would not be acceptable because it fails to give any

consideration to established criteria in deciding the retroactivity question. As indicated earlier, it may be argued that there is nothing new in the Fourth, Fifth, Sixth and Fourteenth Amendments, all of which, together with other constitutional principles, were involved in the cases cited in the preceding paragraph. Those cases simply apply constitutional principles to unusual and distinctive facts in circumstances of a modern and changing society. When the Fourth Amendment was adopted it may have been necessary to show a "trespass" or "actual intrusion into a constitutionally protected area" to constitute a violation of its concepts, but when Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1969) was decided, involving modern electronic surveillance techniques, the court departed from the old trespass and physical intrusion requirements in order to find a violation. The controlling Fourth Amendment principles were not new; they were only applied to a new different and modern set of facts. So it is with *Muniz*. There has been no consideration of the following criteria summarized by the Supreme Court in *Stovall* for determining whether a holding should be given retroactive or prospective effect:

> The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

388 U.S. at 297, 87 S.Ct. at 1970, 18 L. Ed.2d at 1203.

Perhaps the most important of *Stovall's* three principles is the purpose to be served by the new rule. Desist v. United States, *supra*. It is doubtful that a defect in grand jury composition, at least as presently applied to Mexican-Americans, would affect "the very integrity of the fact finding process" and present a

"clear danger of convicting the innocent." Linkletter v. Walker, *supra*; Tehan v. Shott, *supra*. It is more than probable that there are substantial numbers of Texas state prisoners who were indicted by improperly constituted grand juries, but were either tried before properly constituted petit juries or waived their right to trial by pleading guilty.

> [W]hether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree * * *. We are thus concerned with a question of *probabilities* and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial. (emphasis added).

Johnson v. New Jersey, 384 U.S. 719, 729, 86 S.Ct. 1772, 16 L.Ed.2d 882, 889–890 (1966). Moreover, it is easy to foresee that a significant impact on the administration of the criminal laws of Texas, and probably other states as well, may result from retroactive application of the majority decision. We judicially know that enhancement is a vital part of the Texas criminal law system. Upsetting prior convictions may seriously affect enhancement cases. In addition, the use of prior convictions for impeachment purposes is currently being challenged upon the basis that some defect existed in the trial procedure at the time of conviction. Retroactive application would not only necessitate the recalling of grand juries to reindict defendants, but would also require such cases to proceed to retrial before petit juries. This procedure would result in serious clogging of court dockets and in a substantial delay in the administration of justice where other defendants are concerned. The foregoing will serve to demonstrate the reason for my apprehension, but it is entirely likely that the illustrations could be substantially increased.

For the above reasons I must dissent.