**Donald V. DUMONT**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections.**

**Civ. A. No. 72–H–1663.**

United States District Court,
S. D. Texas,
Houston Division.

May 22, 1974.

Harry H. Walsh, Donald L. Kraemer, Huntsville, Tex., for petitioner.

Ben M. Harrison, Asst. Atty. Gen., Austin, Tex., for respondent.

Memorandum and Order:

SINGLETON, District Judge.

On March 26, 1965, Donald V. Dumont, the petitioner here, was convicted of possession of heroin. The jury assessed his punishment at life imprisonment. He filed a petition for writ of habeas corpus, alleging the grounds brought here, in the convicting court. The petition was denied October 17, 1972. The Court of Criminal Appeals denied the writ on December 19, 1972. Petitioner has thus exhausted his state remedies.

On July 25, 1973, a hearing was held on the question in this court. Petitioner contends that he is illegally restrained and that his conviction is void because he was indicted by an illegally constituted grand jury.[1]

The grand jury which indicted Dumont was organized in the November 1964 term of Criminal District Court No. 5, Harris County, Texas. The indictment was filed December 18, 1964.

## I. *The Texas Jury System in 1964*

In 1964, a grand jury was chosen by a two-step process. Much as he does today, a district judge first chose from three to five jury commissioners [Code of Criminal Procedure art. 333, now art. 19.01]. Next, those commissioners hand-picked sixteen grand jurors for the venire [Code of Criminal Procedure art. 338, now art. 19.06]. The statutes set forth in detail the requirements for grand jury commissioners and grand jurors.

Vernon's Annotated Code of Criminal Procedure 1925, art. 333, reads:

Such commissioners . . . shall possess the following qualifications:

1. Be intelligent citizens of the country and be able to read and write the English language;

---

1. The court has determined that a three-judge court, pursuant to 28 U.S.C. § 2281, which was requested by the Attorney General, in this case is not warranted. The portion of the statute which is challenged here is no longer in effect thus making an injunction against its enforcement moot. More importantly, however, in this habeas corpus case, an injunction has not been sought.

2. Be qualified jurors and freeholders in the county;

3. Have no suit in said court which requires intervention of a jury;

4. Be residents of different portions of the county; [and]

5. The same person shall not act as jury commissioner more than once in the same year.

Vernon's Annotated Code of Criminal Procedure 1925, art. 339 [present art. 19.08], reads:

No person shall be selected or serve as a grand juror who does not possess the following qualifications:

1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county, but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

2. He must be a freeholder within the State, or a householder within the county.

3. He must be of sound mind and good moral character.

4. He must be able to read and write.

5. He must not have been convicted of any felony.

6. He must not be under indictment or other legal accusation for theft or of any felony.

Since Dumont's indictment, the grand jury statutes have been revised. In 1965, article 339 was reenacted as article 19.08 to include wives of householders. In 1969, the freeholder-householder requirement was completely deleted from the qualifications for grand jury service. The freeholder requirement for grand jury commissioners was deleted in 1971.

Thus, the provisions of the statute to which Dumont objects are no longer in effect. Cf. Vernon's Annotated Code of Criminal Procedure 1965, arts. 19.01 and 19.08 (Supplement 1972–1973). Dumont contends that the statutes on their face and as they were applied to him were unconstitutional inasmuch as they allowed a selection of a grand jury panel which was not based on a random selection from the rolls of the qualified registered voters, or a representative list of qualified citizens, and which excluded from consideration poor people, daily wage earners, and nonfreeholders. Petitioner alleges that through these statutes the State of Texas has systematically excluded these recognizable classes of people from serving as jury commissioners and grand jurors, basing the exclusion on no reasonable or rational state interest, and that in this way the State has denied him due process and equal protection of the laws by denying him the constitutional right to be indicted by a grand jury representative of the community.

The State has answered that petitioner has waived his right to challenge the indictment and, in the alternative, that his claim is without merit because he himself has not been injured by the selection of the grand jury.

II. *Are old articles 333 and 339 unconstitutional?*

The Texas grand jury system has been challenged many times in the context of racial discrimination. It has always been found capable of constitutional application, although in individual cases the system has failed. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). See also Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966). Petitioner here challenges the statute's constitutionality, both as it is

written and as it is applied, but he does not allege racial discrimination. Since the questions presented here have never been presented to the United States Supreme Court, the holdings of the above-cited cases that the Texas statutes are facially valid are of only limited applicability here.

The first task is to determine what the classifications "freeholder" and "householder" mean. At first blush, they would seem to be wealth and property classifications.

Since Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), poverty has been regarded in certain circumstances as a recognizable and suspect classification. Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), McDonald v. Board of Election Comm'rs, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

Judge Wisdom in his dissent in the first Rodriguez v. Brown, 429 F.2d 269, 274 (5th Cir. 1970) [later reheard en banc], felt that the freeholder requirement was one of wealth: "The requirement that jury commissioners be freeholders is an anachronism offensive to the United States Constitution. 'Lines drawn on the basis of wealth or property, like those of race * * * are traditionally disfavored.'" Harper v. Virginia State Board of Elections, *supra.*

The Supreme Court has recently pointed out in San Antonio Ind. School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), however, that not every classification based on wealth can automatically be assumed to

be suspect. Rather, the Court cautions lower court judges to focus on the unique features of alleged discrimination. *Rodriguez, supra* at 4412.

A study of the statistics presented at trial reveals that the householder-freeholder requirements are not property and wealth requirements in the true sense. They do not separate those who have a certain *amount* of property from those who do not so much as they separate those who have a certain *kind* of property from those who do not.

No doubt anticipating this conclusion, petitioner has further alleged that the grand jury which indicted him was unconstitutional because five prominent Harris County citizens served as jury commissioners and chose as grand jurors a list of sixteen prominent Harris County citizens who indicted him.

### III. *The Statistics*

Petitioner presented two sets of statistics compiled for Harris County. The first set of statistics was taken from the 1970 census figures. They reveal, according to the testimony of a Harris County demographic expert, that a freeholder requirement would eliminate some 40% of the population of Harris County from grand jury service. After correcting for the difference between the census definition and the classic definition of freehold, the requirement would eliminate a substantial portion of the population (some 300,000 to 350,000 persons in Harris County) from serving as jury commissioners.[2]

The expert testified that national census figures revealed that of persons who made more than $5,000 per year in 1970, 80% owned their own homes. Of persons who made less than $5,000, there was one chance in three that they would own

---

2. The parties are in apparent agreement that the term "freeholder" as used in Texas applies to an estate in fee simple, *i. e.*, a qualified or conditional fee and a life estate. In other words, it does not apply to a renter or holder of a lease. The census used, however, used a more restricted definition: persons who live in owner-occupied homes, *i. e.*, persons who own (or are buying) their own home. The expert testified that in his opinion this would make very little difference in the statistics; perhaps 5% to 10% of the population would fall into the classic definition who did not fall into the census definition.

their own home. In the ethnic category, 69% of Whites in Harris County owned a home while only 45% of Blacks or Mexican-Americans owned a home. The expert concluded that the persons excluded by the freeholder requirement would tend to be younger persons, women, Blacks, Mexican-Americans, and the poor.

In order to be a grand juror in 1964, one had to be either a freeholder or a householder. The 1970 census figures reveal approximately 500,000 householders.[3] The expert testified that this would make the grand jury pool differ from the jury commissioner pool only to the extent that it would increase the number of poor and minority males. It would not reduce sexual or age bias as only 10% of the heads of households are female, and the younger one is the less likely one is to be head of a household. He estimated that the freeholder-householder requirement would have reduced the 1970 grand jury pool by 300,000 had Harris County been operating under the old statute.

The expert further testified from past knowledge and study that a system of personal selection tends to solidify into a pattern because most persons do not relate to random selection. The attitudes of an individual are tied to and made up of environment, age, sex, and religious and ethnic background, all of which are variables. Given the fact that district judges who occupy similar socio-economic environments choose grand jury commissioners who in turn choose grand jurors, the expert concluded that it is not likely that an actual cross section of the community will be chosen. In other words, the Texas method of selecting grand juries makes the jury pool even more selective.

This court is concerned in the instant case with the question of whether or not the old Texas grand jury statute by the freeholder-householder requirements for service on the grand jury commission or the grand jury itself created a wealth or socioeconomic classification. The statistics presented on the demographic make-up of Harris County in 1970 are insufficient to support an answer in the affirmative. Setting aside the fact that petitioner was indicted in 1964 and that the demographic evidence was no doubt different from that presented for 1970, the statistics are simply not meaningful enough to support the case petitioner tries to make. They do tend to show that a substantial number of citizens were excluded from consideration as a result of the statute, but they are not strong enough to show that the statute operated to exclude a substantial number of poor people or daily wage earners. Those excluded from the pool are distinguishable from those who were in the pool by the fact that they were not householders or freeholders. Thus, they were excluded for the *kind* of property they owned or for the position they held in their families, not the *amount* of property they owned. The statistics presented do not meaningfully challenge this conclusion.

The second set of statistics presented by the demographic expert represent the result of a questionnaire sent out to some 271 grand jurors who served from the years 1969–1972. Some 58% of these jurors, or 156 persons, returned the answered questionnaire. When the questionnaire was sent out, the freeholder-householder restrictions had been removed as a requirement for grand jury service, although the freeholder requirement for jury commissioners was not removed until 1971.

The statistics compiled from this questionnaire reveal a startling socioeconomic, racial, sexual, and educational imbalance. See Appendix.

The demographic expert concluded that the imbalance was a result of the method

3. Again, the parties are in apparent agreement that the term "householder" refers to one who is the head of a family. It means more than the occupier of a house or a room and implies the management of a household, but a householder need not be married. This definition does not differ substantially from the one used by the census bureau.

of selection of grand jury commissioners and grand jurors.

The statistical and expert opinion evidence presented at the hearing was an attempt to prove that the freeholder-householder requirements excluded a recognizable socioeconomic group and that, as utilized, the statutes allowed a system which tended toward a certain socioeconomic group and in Dumont's case resulted in his indictment by a grand jury which did not represent a cross section of the community.

There was, however, no conclusive evidence that the freeholder-householder requirement itself contributed to the socioeconomic imbalance shown so graphically by the statistics, nor do the statistics conclusively show that a freeholder-householder requirement is a classification based on wealth or race. The statistics are a strong indictment of the method of selecting a grand jury as it was used in 1969–1972, presumably as it was used in 1964, and probably as it is used today; but the same basic selection system has been challenged many times in the racial discrimination context and has been upheld by the Supreme Court. Although this court personally believes that the selection system should not have been held constitutional because it does leave so very little to chance, all he can do is register his disapproval.[4]

Judge Wisdom, concurring in the result of Brooks v. Beto, 366 F.2d 1 (1966), wrote the following words in a racial discrimination case, but it is as applicable here:

[I]f a state wants a superior grand jury, one that carries prestige . . . much can be said for a small, hand-picked, elite, grand jury venire. But it is no great shakes as an example of the "basic concepts of a democratic society and a representative government" extolled in Smith v. State of Texas.

\* \* \* \* \* \*

The grand jury is virtually autonomous and the jury commissioners' selections depend on their subjective judgments. I do not question the good faith of Texas jury commissioners . . . . I suggest, however, that the Texas system and others like it are made to order for subtle but effective discrimination . . . .

The majority in Brooks found, however, that the method of selection itself was not unconstitutional. A concession that the *method* of selection is not on its face constitutional does not, however, preclude a challenge to the householder-freeholder requirements.

The statistics do tend to show that the old grand jury selection statutes excluded a substantial and ascertainable group of citizens and, for that reason, were constitutionally invalid on their face.

The Supreme Court, in Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954), said:

When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a "two-class theory"—that is, based upon differences between "white" and Negro.

In the *Hernandez* case, the court extended the reasoning used in cases concerning racial discrimination against blacks to racial discrimination against

---

4. The Texas grand jury selection allows a small and select group of men, handpicked by the district judges who more often than not choose either their friends or persons who think as they do to, in turn, handpick the grand juries. So much power concentrated in so few hands with so little left to chance is, in this court's opinion, incapable of producing in most cases a fair and impartial cross-sectional and racially representational grand jury. This court cannot decide the question of the constitutionality of the Texas grand jury selection process, however, because that question is not presented in this case.

Mexican-Americans, but the quoted language does not limit itself to the racial context.

■ Race is a suspect classification. When a state classifies its citizens along racial lines, it must show that it had some compelling reason to do so. See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). The freeholder and householder classifications are not in and of themselves suspect classifications nor have they been shown in this case to represent a way of classifying citizens along racial or socioeconomic lines.

■ We have seen, however, that they did exclude an ascertainable and substantial portion of the population from the jury venire and that they did so without any rationality whatsoever. "[T]he Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious." *Rodriguez* at 60 of 411 U.S., Mr. Justice Stewart concurring. A law which requires a grand juror to be a freeholder or householder is arbitrary and capricious even if, as the law in question, it has been on the books since at least 1925.

The Supreme Court itself, by implication, declined to view the "freeholder" qualifications as a classification based on property in Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970). In that case, a requirement that members of a school board be "freeholders" was seen, however, to be "wholly irrelevant to the achievement of a valid state objective" and for that reason was held unconstitutional.[5] This court feels that in this case both the householder and freeholder requirement fit the *Turner* analysis. There is no possible connection between the solemn duty of bringing to justice those accused of crime or of finding citizens to do that solemn duty and a householder or freeholder requirement in the statutes. Householders and freeholders do not have more interest in the community or in bringing alleged criminals to justice than those who do not fit into that category.

The court said in Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972):

> The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose.

We have been shown no rational relationship to a legitimate state purpose here. The State of Texas does not even begin to reach this point, choosing to rely on the defense of waiver and no prejudice to the petitioner.

## IV. *Waiver*

The state contends that although Dumont's case may have merit he has waived his right to challenge the grand jury which indicted him. Texas has a detailed and complicated law governing challenges to the grand jury. Article 358 (now 19.27 Vernon's Annotated Code of Criminal Procedure) provided:

> Before the grand jury has been impaneled, any person may challenge the array of jurors or any person presented as a grand juror. In no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall upon his request be brought into court to make such challenge.

Article 361 (now 19.30) provided for challenges to the "array" for certain

---

5. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), treated a classification akin to the Texas householder requirement but since that case was a voting rights case much of its analysis is inappropriate here.

specified reasons. Article 362 (now 19.-31) set out reasons for a challenge to a particular juror. None of these statutory provisions mention challenges to the array of jurors on constitutional grounds, but case law has provided such a challenge—27 Tex.Jur. "Grand Jury § 23 Texas case law has also relaxed the strict language of the statute when the person indicted is not charged with an offense or in possession of knowledge of a contemplated investigation when the grand jury is impaneled. See Conklin v. State, 141 Tex.Cr.R. 210, 162 S.W.2d 416 (1942); Tyson v. State, 146 Tex.Cr.R. 128, 171 S.W.2d 496 (1943). The rule is that where a defendant does not neglect to challenge the grand jury when it is being organized he can object to the array or to individual grand jurors before trial on a motion to quash the indictment.

The cases upon which the state relies for its waiver theory are either cases involving challenges to grand juries on the grounds of racial discrimination or Texas state court cases which interpret its own grand jury statutes very strictly.

█ █ Although the state may create timetables within which a defendant must assert his constitutional rights or have them held waived, Michel v. Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1965), the writ of habeas corpus is not invariably defeated by a state court's procedural rules. State rules must yield when they conflict with the federal right. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The case presented today differs from the *Michel* case and all other cases which have found waiver in a failure to timely assert a challenge to a grand jury on racial discrimination lines so that their holdings are not precedential here. We must return to the *Fay* rationale.

A challenge to a grand jury on the grounds that it was chosen by a system which employed racial discrimination is an old concept. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Rogers v. Alabama, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904); Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900); Bush v. Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354 (1883).

Few concepts are so well established. In the instant case, the charge is not one of racial discrimination but a challenge of the exclusion of an ascertainable and substantial class of persons defined by the statutes themselves. To this court's knowledge, the case is one of first impression in the federal courts. For that reason, much of the reasoning of most of the grand jury cases is inapplicable. The Texas Court of Criminal Appeals has consistently held that the challenge is not valid. Terry v. State, 451 S.W.2d 479 (1970); Scott v. State, 474 S.W.2d 226 (1971); Aguero v. State, 476 S.W.2d 672 (1972). The petitioner relies heavily on the Fifth Circuit case of Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966), which grew out of the *Michel* case and involved the same parties. Petitioner quotes extensively the language of the majority concerning challenges to grand juries and deliberate bypass. The state just as extensively quotes from the concurring opinion of Judge Bell. Yet, in this case, a detailed consideration of *Labat's* treatment of the waiver point and how it relates to the *Michel* opinion is not necessary, nor is it necessary to discuss in depth the opinion in Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), which held that in federal prosecutions a challenge to the grand jury is waived unless it is raised before trial

pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure.

*Michel, Labat*, and *Davis*, as well as almost all cases concerning waiver of challenges to the grand jury, are, at least in part, cases concerned with racial discrimination. In contrast, this is a case of first impression in federal court which presents a question never successfully raised before. Because the question has never been raised before, the case most in point on the waiver question is Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970). In that case, the Fifth Circuit declared that Muniz, a Mexican-American convicted of rape in 1942, could challenge the makeup of his grand jury in 1967 in a writ of habeas corpus because in 1942 he could not have challenged his grand jury on the grounds he was asserting. Muniz alleged that Mexican-Americans were excluded from grand juries, but because the Supreme Court did not hold that this was a valid objection to the grand jury until 1954 when it handed down Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, the Fifth Circuit held that Muniz could not have waived his rights because his assertions were not recognized as rights until long after his conviction. The court applied the reasoning of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and Fay v. Noia, *supra*, that waiver is "an intentional relinquishment or abandonment of a known right or privilege." 304 U.S. at 464.

Since the *Muniz* case, the Supreme Court has handed down *Davis* and Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). In *Davis* the petitioner in a § 2255 motion was found to have waived his challenge because he failed to make a timely motion. A federal grand jury situation is not completely analogous to a state grand jury situation but much of the reasoning would be the same. *Davis* does not, however, foreclose all untimely challenges to federal grand juries; indeed, Rule 12 (b) of the Federal Rules of Criminal

Procedure provides that "the court for cause shown may grant relief from the waiver." A lack of knowledge of the right because it had not yet been declared a right would seem to be "good cause."

Tollett v. Henderson, *supra*, decided the same day as *Davis*, concerned a waiver to a state grand jury but did not directly address itself to the question of waiver for failure to challenge at the proper time. Rather, it treated the question of waiver of a challenge in the context of a guilty plea.

Thus, the reasoning in *Muniz* is still good law and can be bolstered by language in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), Grosso v. United States, 390 U.S. 62, 70–71, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) and Baker v. Wainwright, 5 Cir., 422 F.2d 145, 149–150. This conclusion is only reasonable in light of *Davis'* analysis of the consequences of allowing a challenge to the grand jury at any time.

> If its [Rule 12(a)] time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying thé raising the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claims could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult.

Davis v. United States, 411 U.S. at 241, 93 S.Ct. at 1582, 36 L.Ed.2d at 224. Dumont testified that he learned of the possibility of challenging his conviction

on these grounds when he came upon Rodriguez v. Brown II, 437 F.2d 34 (5th Cir. 1971) in the prison library. It would have been virtually impossible as well as highly improbable that he or his lawyer would have invented this basis for a challenge and then secreted it for use at this later date. The policy argument which the Supreme Court uses to justify a finding of waiver for untimely challenge simply does not fit here.

## V. *Prejudice*

The State has contended that Dumont, regardless of the merits of his case, has simply not been prejudiced in any way by the statute and for that reason should not have his indictment set aside.

Challenges to a grand jury alone, as distinguished from combined challenges to grand and petit juries, have been sustained by the Supreme Court. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Those cases have, however, been cases on direct appeal, not appeals from federal habeas corpus decisions. The Supreme Court has distinguished the two forms of cases. In Tollett v. Henderson, *supra* n. 1, the Supreme Court referred to language in Parker v. North Carolina, 397 U.S. 790, 798–799, 90 S.Ct. 1458, 1462–1463, 25 L.Ed.2d 785, 793 (1970), "[w]hether the question of racial exclusion in the selection of the grand jury is open in a federal habeas corpus action we need not decide," and then said, "that issue is left open by this opinion, as it was by *Parker*."

Although the Fifth Circuit has spoken to the question directly in U. S. ex rel. Goldsby v. Harpole, 263 F.2d 71, 78 (5th Cir. 1959) and indirectly in Labat v. Bennett, *supra*, neither case directly answered the *Tollett* footnote. The Fifth Circuit, in the habeas corpus context, has since *Goldsby* and *Labat* set aside indictments brought by invalid grand juries without addressing itself to the petit jury question. In *Muniz*, the Fifth Circuit said:

> We will consider in detail only the evidence concerning the selection and composition of the grand jury, for the evidence with regard to that body is overwhelming and is, without more, sufficient to invalidate appellant's conviction. 434 F.2d 701.

The Fifth Circuit has not spoken to the question since; and without further discussion, this court assumes that no more prejudice need be shown in habeas corpus actions than in direct appeals.

■ The Supreme Court has never held that it is a constitutional imperative that a state provide its citizens with a grand jury system. *Cf.* Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1883). When a state makes such provision, however, it must be mindful of due process and equal protection. Peters v. Kiff, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). In the grand jury context, the requirement that states heed due process and equal protection has been translated into a requirement that if the state provides a grand jury an accused be indicted by a grand jury made up from a cross section of the community.

Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), said early in our history, "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." 311 U.S. at 130. Although *Smith* also held the Texas statute constitutional on its face because it was capable of being applied without racial discrimination, that holding does not control here. First, the court, and those courts who followed the holding in *Smith*, were not faced with a challenge to the statute providing for freeholder and householder requirements.[6] Second, they were not faced with the question of

---

**6.** The court believes that the language of footnote 28 of Turner v. Fouche, 396 U.S. 346, 363, 90 S.Ct. 532, 24 L.Ed.2d 567, indicates that the court's per curiam opinion in Vought

whether the Texas statute is capable of being used without discrimination against other, less-noticeable, classes of people. The Fifth Circuit said, in Brooks v. Beto, 366 F.2d 1, 11 (5th Cir. 1966), "we know first that it is a constitutional imperative that the jury, grand or trial, fairly represent the community," and again, in Billingsley v. Clayton, 359 F.2d 13, 18 (5th Cir. 1966), "[t]he aim and purpose of the law is to obtain juries which represent a cross-section of the community."

Cross section of the community does not necessarily mean a racial cross section of the community, although most cases have dealt with a race situation. The discussion in Labat v. Bennett, *supra*, of the systematic exclusive of wage earners from grand and petit juries is relevant here. The Fifth Circuit's analysis that " 'the very integrity of the fact-finding process' [7] depends on impartial venires representative of the community as a whole" was reiterated six years later by the Supreme Court in Peters v. Kiff, *supra*. Although *Peters* was a racial discrimination case [8] its language is very strong:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. 407 U.S. at 503.

The prejudice necessary in such cases is not individual, actual harm or prejudice, but the very threat to the desired possibility that the jury will reflect a cross section of the population.

Peters v. Kiff went on to say:

It is the nature of the practices here challenged that proof of actual harm or lack of harm is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how the jury would have decided the case. Consequently, it is necessary to decide on principle which side shall suffer the consequences of unavoidable uncertainty [cites] . . . any doubt should be resolved in favor of giving the opportunity for challenging the jury in too many defendants, rather than giving it to too few. 407 U.S. at 504.

■ Taken out of context, the language in Peters v. Kiff would seem to compel a decision that Dumont was prejudiced by the very application of the statute. The fact remains, however, that *Peters* concerned exclusions from the grand jury for reasons of race. Labat v. Bennett, too, although concerned with the systematic exclusion of wage earners from grand and petit jurors, had distinct racial and socioeconomic overtones. The situation in this case is different. Here the racial composition of the grand jury is not challenged, and there is insufficient evidence to prove that the exclusions resulted in discrimination based on a wealth classification. This court simply cannot extend the language of *Labat* and *Peters* to a context so divorced from those situations. Clearly, the Texas state legislature has been arbitrary in excluding nonfreeholders and nonhouseholders from grand jury participation for many years; and, clearly, nonfreeholders and nonhouseholders may have something to offer to the panel which freeholders and householders do not have. But would what they had to offer be so distinct and different that

---

v. Wisconsin, 217 U.S. 590, 30 S.Ct. 694, 54 L.Ed. 895 (1910), is not authority for the decision he makes today.

7. Quoting Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) at 723.

8. It concerned a white man who challenged his indictment and conviction on the basis that Blacks had been systematically excluded from the grand and petit juries.

a court can say their exclusion, in some indefinable way, prejudiced a defendant? This court thinks not. The situation is different from a consideration of a class of persons grouped by race, ethnic backgrounds, way of earning a living, or sex. A court can say that those persons do have something to offer a panel which is sorely lacking when they are excluded, even if what they have to offer cannot be articulated. It has been shown, however, that householders and freeholders come from all walks of life, socioeconomic areas, races, and ethnic groups; and the fact that all grand juries may not have been composed of a cross section of the community has not been shown to be a result of the householder-freeholder requirement of the statute. When the makeup of the excluded group of persons is in all other respects substantially identical to and therefore adequately represented by those who remain in the grand jury pool, there is no prejudice to the petitioner. The "qualities of human nature and varieties of human experience" possessed by freeholders and householders taken as a whole were substantially identical to those characteristics possessed by non-householders and nonfreeholders. Although the exclusion of nonhouseholders and nonfreeholders may have on its face offended due process of law, the petitioner validly convicted by a petit jury was not prejudiced.

## VI. *Additional Grounds*

Petitioner has also contended that the grand jury which indicted him December 1964 was not a cross section of the community and for that reason he was unconstitutionally indicted.

There are three ways in which he alleges the grand jury was unconstitutional:

(1) The pool from which the grand jurors were chosen was numerically insufficient. In other words, petitioner contends that the requirements of the statute excluded 300,000 persons from the grand jury pool and that these persons constituted a distinct class of people, unrepresented by the remaining pool of persons. This contention has been rejected.

■ (2) The pool from which the grand juries were selected did not represent a cross section of the Harris County community (essentially the question presented at (1), above), and the grand jurors actually chosen did not represent a cross section of the Harris County community. The evidence presented at the hearing reveals almost nothing about the grand jury which indicted Dumont. As far as anyone knew, they were all freeholders or householders since both the judge and the commissioners took care to see that the letter of the statute was followed. There are no Spanish surnames on the list and only three names of women on the list of sixteen persons. The testimony emphasized that there were two black men, high on the socioeconomic ladder, on the list. The rest of the evidence relied upon came from the aforementioned statistical studies of the grand jury system in Harris County, made in years after 1969. In Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), the Supreme Court, speaking in a civil case, said:

The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community . . . . This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political, and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups . . . .

The language was later quoted approvingly in a federal criminal case, Ballard

v. United States, 329 U.S. 187, 192–193, 67 S.Ct. 261, 91 L.Ed. 181 (1946). The petitioner agrees with this language but asserts that the court officials in his case systematically and intentionally excluded a cross section of the community. The only substantial evidence to tie the statistics to Dumont's case has been the statute itself. As I have held above, however, the exclusion of nonfreeholders and nonhouseholders in and of itself does not constitute a failure to constitute a cross-sectional grand jury, or at least one which is prejudicial to the petitioner. The other proof, essentially a list of Dumont's grand jurors and the grand jury commissioners who chose them, is insufficient to carry the burden of proving that the grand jury commissioners systematically excluded persons who would have made up a cross section of the community. The petitioner quite correctly says that the Supreme Court has held that affirmation of good faith in making selections are insufficient to dispel a prima facie case of systematic exclusions. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). He has failed, however, to make even a prima facie case that his grand jury was not a cross section of the community.

(3) The method of selection of grand jurors in Harris County aggravated the already discriminatory statute so that the grand jurors actually chosen were even less representative of the Harris County community than the pool from which they were chosen. The method of grand jury selection was statutory. There is no evidence that Harris County treated the grand jury choice different from any other county or that Harris County abused the statute. This court simply does not have enough evidence on which to base a complete upsetting of the Texas Grand Jury statute, as it existed in 1964. Unfortunately, we have no demographic study for 1964; we do not have any evidence of the make-up of Dumont's grand jury other than a list

of the names and some information on the men who chose them. Those men were all from the upper middle class. Many of them were prominent, even wealthy, men in the community. The four men who testified, however, all asserted that they had been charged with choosing a cross section and they all attempted to do so. We have no other information.

■ The court concludes that Mr. Dumont's contention that the grand jury which indicted him was not a cross section of the community at that time is without merit.

The petition for writ of habeas corpus is hereby denied.

## APPENDIX

| Sex | Grand Jury | County |
|---|---|---|
| Male | 78% | 49% |
| Female | 22% | 51% |

| Age | Grand Jury | County |
|---|---|---|
| 21–35 years | 10% | |
| 36–50 years | 43% | 24% |
| 51–65 years | 37% | |
| Over 65 | 10% | |

| Income | Grand Jury | County |
|---|---|---|
| Under $ 5,000 | 1% | 16% |
| $ 5,000–$10,000 | 3% | 31% |
| $10,000–$15,000 | 25% | 29% |
| $15,000–$20,000 | 16% | 9% |
| Over $20,000 | 55% | 15% |

| Race | Grand Jury | County |
|---|---|---|
| Anglo | 82% | 69% |
| Negro | 15% | 20% |
| Mexican-American | 3% | 11% |

| Education | Grand Jury | County |
|---|---|---|
| Less than high school | 0% | 24% |
| Some high school | 3% | 23% |
| High School degree | 8% | 25% |
| Some college | 34% | 13% |
| College degree | 32% | 15% |
| Graduate degree | 23% | |

| Employment | Grand Jury | County |
|---|---|---|
| Business executive | 35% | |
| Proprietor | 7% | |
| Professional | 20% | |
| Employed Worker | 13% | |
| Retired | 13% | |
| Housewife | 11% | |
| Other | 1% | |